IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SANDRA JOSE,

      Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

      Defendant.

Case No. 1:16-cv-02340-SB

**OPINION AND ORDER**

**BECKERMAN, Magistrate Judge.**

      Sandra Jose ("Plaintiff") brings this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her applications for Social Security disability insurance benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court affirms the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

# BACKGROUND[1]

Plaintiff was born in November 1961, making her fifty years old on November 8, 2011, the amended alleged disability onset date.[2] (Tr. 16, 31, 464-65.) Plaintiff has a high school education and "no past relevant work." (Tr. 27.) In her applications for benefits, Plaintiff alleges disability due to chronic back pain, Hepatitis C, anxiety, seizures, degenerative disc disease, stress intolerance, scoliosis, arthritis in her hands and wrists, and a "possible history of stroke." (Tr. 31, 58.)

On September 27, 2011, approximately one month before the amended alleged disability onset, Dr. Barbara Moura ("Dr. Moura"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 36-37.) Based on a review of the medical record, Dr. Moura concluded that Plaintiff's mental impairments failed to satisfy listing 12.04 (affective disorders).

Also on September 27, 2011, Dr. Moura completed a mental residual functional capacity assessment form, in which she rated Plaintiff's limitations in each of twenty categories of mental ability. (Tr. 40-42.) Dr. Moura rated Plaintiff to be "not significantly limited" in fourteen categories and "moderately limited" in six categories. (Tr. 40-42.) Dr. Moura added that Plaintiff is capable of "understanding, remembering, and carrying out simple, repetitive 1-2 step tasks,"

---

[1] Citations to the Transcript refer to the page numbers listed in the top-right corner of each page.

[2] Plaintiff initially alleged a disability onset date of September 15, 2010. (Tr. 31, 463.) During her administrative hearing, Plaintiff asked to amend the alleged disability onset date to November 8, 2011, because there was "not evidence" to support the original onset date of September 15, 2010, which is the date that Plaintiff "stopped working" for reasons that were "not due to a disability." (Tr. 463-64.) The Administrative Law Judge "accept[ed] the amendment," but nevertheless "consider[e]d the entire record before him when making [his] findings[.]" (Tr. 16.)

interacting "appropriately" with "supervisors and peers," and engaging in limited public contact. (Tr. 42.)

On September 14, 2011, Plaintiff was referred to Dr. Sid Cormier ("Dr. Cormier"), a clinic psychologist, for a comprehensive mental evaluation. (Tr. 246-51.) Based on his clinical interview, review of limited records, and examination, Dr. Cormier diagnosed Plaintiff with a major depressive disorder and an anxiety disorder not otherwise specified. (Tr. 250.) Dr. Cormier also assigned Plaintiff a current Global Assessment of Functioning ("GAF") score of fifty-five.[3] (Tr. 250.)

In addition, Dr. Cormier stated that Plaintiff's (1) depression and anxiety "are likely to seriously impair her ability to perform complex and detailed tasks, and perhaps moderately impair her ability to perform simple and repetitive ones as well," (2) depression and anxiety "may mildly to moderately impair her ability to maintain regular attendance, but moderately to severely impair her ability to perform work activities on a consistent basis," (3) "ability to complete a normal workday or workweek without interruptions resulting from the ramifications of her depression and anxiety overall appears moderately to seriously impaired at this time," (4) "mental status information was not suggestive of impairment regarding her ability to accept and remember instructions from supervisors," but "she may have difficulty remembering complex instructions," (5) "history and interview behavior suggested moderate impairment regarding her ability to interact with co-workers and the general public," (6) "history and response to the stress

---

[3] A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (citation omitted). "A GAF score of fifty-one to sixty 'indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Collins v. Comm'r Soc. Sec.*, 357 F. App'x 663, 665 n.2 (6th Cir. 2009) (citation omitted).

of the evaluations suggested moderate impairment regarding her ability to deal with typical stresses that she might encounter in a competitive work situation," (7) exam "demonstrated moderate impairment regarding sustained concentration and pace, but only mild impairment regarding persistence," (8) "current depressive state could lead to decompensation in a work-like setting at this time," and (9) "ability to adjust to routine changes in a work setting appears mildly impaired." (Tr. 250.)

On October 1, 2011, Plaintiff was referred to Dr. John Simmonds ("Dr. Simmonds") for a comprehensive internal medical evaluation. (Tr. 252-56.) During a clinical interview, Plaintiff reported that she last worked as a groundskeeper in 2010, that she suffered an "industrial related lower back injury" in 2003, that her x-rays and MRIs "have been consistent with degenerative disc disease of the lower lumbar" spine, and that physical therapy and epidural steroid injections resulted in "minimal to moderate improvement." (Tr. 252.) Dr. Simmonds noted that Plaintiff's movements were "normal," she was "able to sit comfortably without shifting in the chair," she was "able to stand up from a sitting position and sit up from the supine position without difficulty," her range of motion was "within normal limits for the upper and lower extremities," her straight leg tests were negative bilaterally and her sciatic nerve stress test was also negative, her motor strength was "graded to be normal at 5/5," she did "not become unbalanced by bending or twisting," her Romberg's test was negative, and her gait and station was within normal limits. (Tr. 254-55.)

Dr. Simmonds opined that Plaintiff can push, push, lift, and carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours per day, occasionally engage in "postural activities, i.e., bending, kneeling, stooping, crawling, and crouching," occasionally engage in "[a]gility, i.e., walking on uneven terrain, climbing ladders, or working at heights,"

and sit "without restrictions." (Tr. 256.) Dr. Simmonds also found no restrictions in terms of Plaintiff's ability to hear, see, or use "both hands for performing fine and gross manipulation." (Tr. 256.)

On November 7, 2011, Dr. Nick Mansour ("Dr. Mansour"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 38-40.) Based on his review of the medical record, Dr. Mansour concluded that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for about six hours in an eight-hour workday; push and pull in accordance with her lifting and carrying restrictions; frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds. Dr. Mansour added that Plaintiff does not suffer from any manipulative, visual, or communicative limitations, but she does need to avoid concentrated exposure to workplace hazards, such as machinery and heights (i.e., environmental limitations).

On November 8, 2011, a magnetic resonance imaging ("MRI") scan of Plaintiff's lumbar spine revealed the following: (1) "[n]o significant central or neural foraminal narrowing . . . at any level within the lumbar spine," (2) a "near Grade I anterolisthesis of L5 over SI," which "is most likely due to severe bilateral degenerative facet disease seen at this level,"[4] (3) "posterior disc bulging at every level within the lumbar spine," (4) "[m]ultiple areas of degenerative facet disease," and (5) "moderate to severe loss of disc space height at L3-4 and moderate loss of disc

---

[4] "'Anterolisthesis is a spine condition in which the upper vertebral body, the drum-shaped area in front of each vertebrae, slips forward onto the vertebra below. The amount of slippage is graded on a scale from 1 to 4. Grade 1 is mild (less than 25% slippage), while grade 4 is severe (greater than 75% slippage).'" *Bravo v. Berryhill*, No. 16-5741, 2017 WL 2485222, at *3 n.9 (C.D. Cal. June 8, 2017) (citation omitted).

space height as L4-5, as well as L5-S1, consistent with changes of degenerative disc disease." (Tr. 257.)

On February 22, 2012, a computer tomography ("CT") scan of Plaintiff's cervical spine revealed the following: (1) "[n]o fracture," (2) "[m]inimal retrolisthesis of C5 on C6," and (3) "[b]iapical slightly nodular pleural parenchymal scarring [that] may be post-inflammatory."[5] (Tr. 275.)

Also on February 22, 2012, a CT scan of Plaintiff's orbital bones revealed, *inter alia*, "[a]cute fractures through the right orbital floor, nasal bones, and right anterior maxillary sinus wall," an "[e]quivocal acute buckled fracture deformity of the right lateral maxillary sinus wall," "[r]ight periorbital soft tissue swelling," and "[s]cattered paranasal sinus mucosal thickening." (Tr. 276.) A CT scan of Plaintiff's head also revealed "[n]o acute intracranial abnormality." (Tr. 277.) In addition, a radiograph of Plaintiff's chest revealed, *inter alia*, a "normal" cardiac silhouette, "[c]lear lungs," and "what appeared to be old right-sided upper rib fractures." (Tr. 272, 278.)

On September 11, 2012, Plaintiff visited Sarah Craft ("Craft"), a physician's assistant, complaining of worsening lower back pain. (Tr. 279.) Plaintiff described her pain as "excruciating constant [pain] shooting down [the] back of [her] legs to [her] knees[.]" (Tr. 279.) Craft noted that an MRI of Plaintiff's lumbar spine had revealed "facet disease [at] L5-S1 and at multiple levels, [and] severe [degenerative disc disease] at L3-L4," that Plaintiff reported "[n]o new numbness or weakness," that Plaintiff's pain "responds to medications," and that Plaintiff

---

[5] The injuries Plaintiff sustained in February 2012 were reportedly related to an incident of domestic violence between Plaintiff and her boyfriend. (*See* Tr. 271, "Reportedly the patient was assaulted by her boyfriend who beat [the patient] with [his] fists about her head, scalp, and face.")

recently "ran out" of pain "medication because of visit compliance" issues at her doctor's office. (Tr. 273.)

Plaintiff returned to Craft's office on September 18, 2012. Plaintiff informed Craft that she was "applying for disability" due to seizures, chronic lower back pain, chronic obstructive pulmonary disease ("COPD"), and Hepatitis C, and that she wanted a "letter stating her work abilities [and] explaining why she can't work." (Tr. 296.) Craft noted that Plaintiff has "severe noncompliance" issues, that Plaintiff reported being examined by a neurologist regarding her alleged seizures (but that predated Plaintiff's treatment at Craft's medical office), and that Plaintiff reported undergoing a brain MRI with Craft's "office but [there was] no record." (Tr. 296.)

On June 18, 2013, an MRI of Plaintiff's lumbar spine revealed no "evidence of fracture" and "[m]oderate to advanced multilevel discogenic and facet degenerative disease[.]" (Tr. 395.) An MRI of Plaintiff's cervical spine revealed no fracture and "mild to moderate multilevel discogenic and facet degenerative disease, which is most notable [at] the C5-C6 and C6-C7 levels." (Tr. 396.) In addition, an MRI of Plaintiff thoracic spine revealed no "evidence of fracture or soft tissue injury," and "[m]ild to moderate multilevel discogenic degenerative disease[.]" (Tr. 397.)

On June 25, 2014, Plaintiff visited her primary care physician, Dr. Harold Budhram ("Dr. Budhram"). Plaintiff informed Dr. Budhram that she continued to suffer from lumbar pain that "radiates to [her] bilateral hips," that she injured her back while working as a janitor in 2003, and that she underwent two rounds of epidural steroid injections, which only "worked for 2 weeks." (Tr. 409.) Plaintiff added that she "want[ed] to discuss starting [a prescription for] Oxycodone."

(Tr. 409.) Dr. Budhram agreed and started prescribing Oxycodone to treat Plaintiff's pain. (Tr. 411.)

On August 12, 2014, an Administrative Law Judge ("ALJ") posed a series of hypothetical questions to a Vocational Expert ("VE") who testified at an administrative hearing. (Tr. 460-85.) First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform light work that involves occasionally climbing, crawling, crouching, stooping, or kneeling, no more "than occasional exposure to heights, moving machinery, or similar hazards," no more than occasional "walking on uneven terrain," no more than occasional interaction with co-workers and the general public, and "simple, repetitive, routine tasks." (Tr. 483.) The VE testified that the hypothetical worker could be employed as a "[s]tuffer," motel cleaner, and "[m]arking [c]lerk." (Tr. 483.) Responding to the remaining questions posed by the ALJ and Plaintiff's hearing representative, the VE testified that the hypothetical worker could not sustain gainful employment if she was "late to work" more than "two days per month . . . on an ongoing basis," had more than two "unexcused or unscheduled absences" per month "on an ongoing basis," was off task more than five percent of the time outside normal breaks, or needed unscheduled, twenty-minute breaks up to three times daily. (Tr. 484-85.)

In a written decision issued on September 8, 2014, the ALJ applied the five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Plaintiff was not disabled. *See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.      LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.     THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 16-29.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 8, 2011, the amended alleged disability onset date. (Tr. 18.) At step two, the ALJ determined that Plaintiff had the following severe impairments: "[M]ultilevel discogenic and facet degenerative disease of the cervical spine, multilevel discogenic degenerative disease of the thoracic spine, multilevel discogenic and facet degenerative disease of the lumbar spine, major depressive disorder, and anxiety disorder." (Tr. 19.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 19.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work that involves (1) occasionally climbing, kneeling, crawling, crouching, and stooping, (2) no more than occasional exposure to heights, moving machinery, and "similar hazards," (3) no more than occasional "walking on uneven terrain," (4) no more than occasional interaction with co-workers and the general public, and (5) carrying out "only simple, routine repetitive tasks." (Tr. 21.) At step four, the ALJ concluded that Plaintiff had no past relevant work experience. (Tr. 27.) At step five, the ALJ determined that Plaintiff was not disabled because a significant number of jobs existed in the national economy that Plaintiff could perform, including work as a "stuffer," motel cleaner, and "marking clerk." (Tr. 28.)

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of

evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide specific, clear, and convincing reasons for discounting Plaintiff's symptom testimony; (2) failing to provide germane reasons for discounting the lay witness testimony provided by Plaintiff's friend, William Miller ("Miller"); and (3) failing properly to consider the opinion of his examining physician, Dr. Simmonds. (Pl.'s Opening Br. at 1-2, 11, 14.) As explained below, the Court finds that the ALJ's decision is free of harmful legal error and supported by substantial evidence in the record. Accordingly, the Court affirms the Commissioner's denial of Plaintiff's applications for benefits.

## I.    PLAINTIFF'S SYMPTOM TESTIMONY

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664,

678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### B.    Application of Law to Fact

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or symptoms alleged. (*See* Tr. 25, finding that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms"; Def.'s Br. at 3, stating that the clear and convincing reasons standard applies "in the absence of malingering," and arguing that the ALJ met clear and convincing reasons standard or

the substantial evidence standard). Accordingly, the ALJ was required to provide clear and convincing reasons for discrediting Plaintiff's subjective symptom testimony. The ALJ met that standard here.

As an initial matter, Plaintiff argues that the ALJ's subjective symptom analysis was flawed because the ALJ failed to meet the specificity requirements explained in *Brown-Hunter v. Colvin*, 806 F.3d 487 (9th Cir. 2015). (*See* Pl.'s Opening Br. at 4, citing *Brown-Hunter* and arguing that the ALJ's "recitation of facts was not tied to any specific allegations" and that the ALJ "erred in failing to specifically identify how the evidence summarized related to Plaintiff's allegations"; Pl.'s Reply at 3, arguing that the ALJ's analysis "was no more helpful in assessing the legal sufficiency of the ALJ's reasoning than the boilerplate language in *Brown-Hunter*"). In *Brown-Hunter*, the ALJ "stated only that she found, based on unspecified claimant testimony and a summary of medical evidence, that 'the functional limitations from the claimant's impairments were less serious than she has alleged.'" 806 F.3d at 493. The Ninth Circuit held that the ALJ's symptom analysis was erroneous, noting that a reviewing court could not "discern the agency's path because the ALJ made only a general credibility finding without providing any reviewable reasons why she found [the claimant's] testimony to be not credible." *Id.* at 494.

This case is distinguishable from *Brown-Hunter* on two grounds. First, the ALJ in this case did not make "only a general credibility finding without providing any reviewable reasons" for doing so. Rather, as demonstrated below, the ALJ provided specific reasons for discounting Plaintiff's testimony. (*See also* Tr. 25, setting forth specific reasons for discounting Plaintiff's testimony and providing a detailed explanation in support of each of those reasons). Second, *Brown-Hunter* is distinguishable because, even if the ALJ could have stated each reason more clearly, the Court is still able to "reasonably discern" the ALJ's path. *See Despinis v. Comm'r*

*Soc. Sec. Admin.*, No. 2:16-cv-01373-HZ, 2017 WL 1927926, at *7 (D. Or. May 10, 2017)

(finding the claimant's reliance on *Brown-Hunter* "unavailing," and stating that although "the

ALJ's opinion could have more clearly stated each reason and how it served to discount

Plaintiff's credibility, the Court is able to 'reasonably discern' the ALJ's path") (citation

omitted); *see also Potter v. Astrue*, No. 6:10-cv-01527-SI, 2012 WL 1071131, at *10 n.5 (D. Or.

Mar. 29, 2012) ("As the Ninth Circuit has explained, it is not necessarily reversible error when

the ALJ fails to explicitly link his reasons to the rejection of certain evidence, as long as his

reasoning is clear from his decision") (citations omitted), *rev'd on other grounds*, 571 F. App'x

569 (9th Cir. 2014).

    Having rejected Plaintiff's reliance on *Brown-Hunter*, the Court turns now to the ALJ's

specific, clear, and convincing reasons for discounting Plaintiff's symptom testimony. First, the

ALJ discounted Plaintiff's symptom testimony based on Plaintiff's inconsistent testimony about

her symptoms and treatment. (*See* Tr. 25, finding Plaintiff's testimony "not entirely credible,"

and noting, *inter alia*, that Plaintiff's "testimony was inconsistent in regards to her seizures,"

Plaintiff made representations regarding her treatment for seizures that were not supported by her

medical records, Plaintiff "claimed that she had seizures daily, then weekly, then not at all for

two years," "there was no logical pattern to her reporting regarding seizure activity," and

Plaintiff's "testimony regarding the onset of her problems also showed substantial

inconsistencies, in that she tied everything back to the death of her boyfriend but later asserted

that her medical problems were not disabling until more than 12 months after his death").

Plaintiff's inconsistent testimony was a clear and convincing reason for discounting her symptom

testimony. *See Cantrall v. Colvin*, 540 F. App'x 607, 610 (9th Cir. 2013) (holding that the ALJ

met the clear and convincing reasons standard, and noting that the ALJ discounted the claimant's

testimony based on claimant's "inconsistent testimony about his symptoms and treatment");

*Cattano v. Berryhill*, 686 F. App'x 408, 411 (9th Cir. 2017) (holding that the ALJ met the clear and convincing reasons standard, and noting that an "'ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct'" (quoting *Molina*, 674 F.3d at 1112-13)).

Substantial evidence supports the ALJ's decision to discount Plaintiff's testimony on this ground. (*Compare* Tr. 465-68, "[W]hat happened on November 8, 2011, that you feel made it impossible for you to continue working in any capacity? A. I had a boyfriend of seven years that passed away [in June 2010]. . . . [M]onths after that [i.e., 'right before Thanksgiving' in late November 2011,] I had to move [off of his parents' property], [so] I was under a lot of stress and I started having seizures and my back . . . pain was getting worse [due to seizure-related fall/reinjury]," Tr. 194-96, indicating that Plaintiff filled out a questionnaire on October 16, 2012, stating that she started having seizures on the "[d]ay before Thanksgiving" in late November 2011, citing a doctor's visit on September 11, 2012, as the only specific date when a recent seizure occurred, and stating that Dr. Budhram treats Plaintiff's seizure disorder every three months, *with* Tr. 279-80, visiting Dr. Budhram's office on September 11, 2012, complaining only about worsening back pain, and making no mention of any seizure that occurred on or before that date, Tr. 296-97, visiting Dr. Budhram's office on September 18, 2012, requesting a disability letter explaining "why she can't work," and reporting a history of seizures and treatment, but Dr. Budhram's office could find "no record" of an MRI that Plaintiff reports he ordered, Tr. 197, noting that Plaintiff's representative believed that Plaintiff had visited a neurologist, "Dr. Saleh," regarding a workup for seizures and possible stroke, but the Social Security Administration contacted his office regarding an outstanding request for

Plaintiff's medical records, and Dr. Saleh's office conducted a search using Plaintiff's name and "AKAs" and found no record of Plaintiff "even be[ing] scheduled for an app[ointment] at their office," Tr. 470, "So now, it's under control, my seizures. . . . I would say it's been under control. I'm married [now], and . . . I haven't had a seizure like I was having [before] in about two years," Def.'s Br. at 5, "Other than a single [self-]report of [a] 'seizure recently' . . . in January 2012, the undersigned was unable to locate medical records indicating she sought treatment for seizures from a medical provider").[6]

Second, the ALJ discounted Plaintiff's testimony on the ground that she engaged in activities that were inconsistent with Plaintiff's estimation of her abilities. (*See* Tr. 25, finding that Plaintiff "engaged in activities that seem inconsistent with her alleged limitations.") This is a clear and convincing reason for discounting Plaintiff's symptom testimony. *See Samuels v. Colvin*, 658 F. App'x 856, 857 (9th Cir. 2016) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, including the fact that the claimant's self-reported activities "were inconsistent with [the claimant's] estimation of her abilities"); *Martin v. Colvin*, No. 3:14–cv–01603–SB, 2016 WL 890106, at *8 (D. Or. Feb. 9, 2016) ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support [an ALJ's subjective symptom analysis].") (citation omitted). Substantial evidence supports the ALJ's decision to discount Plaintiff's testimony on this ground. (*Compare* Tr. 165, 169-70, noting that Plaintiff testified on August 30, 2011, that she cannot sit for longer than

---

[6] The ALJ's decision cites to many, but not all, of the inconsistencies referenced in this decision (i.e., the inconsistencies in Plaintiff's testimony or between Plaintiff's testimony and her conduct or estimation of her abilities). Nevertheless, it is appropriate for the Court to consider additional support for a ground on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.") (citation omitted).

fifteen minutes due to pain, that it takes fifteen minutes to get out of bed due to pain, that she cannot walk for more than fifteen minutes due to pain, and that she does not "spend time with others," Tr. 248, indicating that Plaintiff reported on September 14, 2011, that "severe anxiety attacks" are one of her primary barriers to employment, that she left her last job "due to her back pain and anxiety around people," and that "her ability to interact with others, such as the general public," has decreased and thus "she would not be able to perform the duties at her previous job," Tr. 472, "What sort of symptoms are you having that you feel would keep you from working at the present time? A. . . . I can't sit or stand very long," *with* Tr. 463-64, acknowledging that Plaintiff "stopped working" for reasons that were "not due to a disability," Tr. 470-76, noting that Plaintiff testified on August 12, 2014, that her last job was actually a "six-month temporary position" that "just came to an end," that she received unemployment benefits after that job ended, even though Plaintiff claims that she could not work at the time because her back reportedly would not "allow [her] to stand or sit very long," that Plaintiff was introduced to her now-husband by a mutual friend and got married on December 1, 2012, that Plaintiff and her husband ride a Greyhound bus to California to see a doctor who prescribes Plaintiff medication, and that Plaintiff is able to tolerate staying at a shelter with others for extended periods of time, camp outside, go shopping, to church, on walks to the park, and to the library on a frequent basis, use social media, and play games on a phone or computer).

Third, the ALJ discounted Plaintiff's testimony on the ground that she "has a very poor work history," which suggested that she had "little motivation to return to the workforce." (Tr. 26.) Plaintiff agrees with the ALJ's finding that she has a poor work history, but takes issue with the ALJ's finding that her motivation might have been impacted by the fact that her wages could

be garnished since she has been in arrears on her child support payments.[7] (*See* Pl.'s Opening Br. at 9, stating that the "ALJ accurately noted that Plaintiff had a poor work history," but that "the ALJ's speculation on the chilling effect of Plaintiff's past-due child support had no evidentiary basis in the record before him"). It is immaterial whether the record supports the ALJ's finding that Plaintiff's past-due child support might have impacted her motivation to work, because Plaintiff's poor work history alone is a clear and convincing for discounting her testimony. *See Whitten v. Colvin*, 642 F. App'x 710, 712 (9th Cir. 2016) (holding that the ALJ met the clear and convincing reasons standard, and noting that the "ALJ reasonably determined that [the claimant's] poor work history suggested that his primary barrier to work was his lack of motivation, rather than a disability"); *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, and noting that the claimant "had an extremely poor work history and has shown little propensity to work in her lifetime, which negatively affected her credibility regarding her inability to work").

Fourth, the ALJ discounted Plaintiff's testimony based on evidence of medical noncompliance. Medical noncompliance is a clear and convincing reason for discounting a claimant's symptom testimony. *See, e.g.*, *Thebo v. Astrue*, 436 F. App'x 774, 775 (9th Cir. 2011) (holding that the ALJ provided clear and convincing reasons for discounting the claimant's symptom testimony, and citing "medical noncompliance" as one of those clear and convincing reasons).

Plaintiff claims that "[t]he only references to non-compliance in the record were in treatment *notes* from September 2012," and that this "*single* reference to non-compliance was

---

[7] Plaintiff reported that she lost her driver's license in 1997 due to "outstanding child support payments." (Tr. 246, 463.)

not substantial evidence supporting the ALJ's findings." (Pl.'s Opening Br. at 10) (emphasis added). The Court is not persuaded by this argument. On September 18, 2012, the day that Plaintiff requested a letter explaining "why she can't work," the assistant for Plaintiff's primary care physician, Dr. Budrham, noted that Plaintiff had a history of "severe" medication and visit compliance issues, and the assistant discussed those issues with Plaintiff. (Tr. 296-97.) The assistant also referenced a similar issue on September 11, 2012, noting that Plaintiff ran out of medication due to "visit compliance" issues. (Tr. 279.) In addition, "Plaintiff's California provider documented over 11 instances of failure to show up or a late reschedule." (Def.'s Br. at 8, citing Tr. 215-19, 223, 234-35, 237-39). In the Court's view, the foregoing amounts to substantial evidence supporting the ALJ's decision to discount Plaintiff's testimony on this ground.

Furthermore, and contrary to Plaintiff's argument, the ALJ did not err by failing to seek an explanation from Plaintiff about her medical non-compliance issues. (*See* Pl.'s Opening Br. at 10.) Indeed, the medical records are unambiguous on this point and, although a claimant may have a good reason for not complying (i.e., a lack of access to free or low-cost services or an inability to afford treatment), nothing in the record suggests that Plaintiff was unable to access medical treatment. In fact, the record suggests that Plaintiff travels out of state to access treatment. Accordingly, the Court concludes that the ALJ's duty to develop the record was not triggered here. *See Smith v. Berryhill*, 708 F. App'x 402, 404 (9th Cir. 2017) (rejecting the claimant's argument that the ALJ's subjective symptom analysis was flawed because "[n]othing in the record triggered the ALJ's duty to develop the record," and noting that "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the

record is inadequate to allow for proper evaluation of the evidence") (citation and quotation marks omitted).

Based on the foregoing, the Court declines to second-guess the ALJ's subjective symptom evaluation because it is reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("[T]he ALJ's interpretation of [the claimant's] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."); *see also Chesler v. Colvin*, 649 F. App'x 631, 632 (9th Cir. 2016) (holding that the ALJ provided two clear and convincing reasons for discounting a claimant's testimony, and thus concluding that, "[e]ven assuming that the ALJ erred in rejecting [the claimant's] symptom testimony for other reasons, any error was harmless" (citing *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004))); *Garza v. Astrue*, 380 F. App'x 672, 673-74 (9th Cir. 2010) ("The ALJ explicitly provided four reasons for rejecting Garza's testimony about the severity of her pain. We do not find three of the four reasons to be clear and convincing. Nevertheless, the ALJ also implicitly found that Garza's testimony conflicted with the medical record. Coupled with the lack of objective medical evidence, these contradictions amount to substantial evidence supporting the ALJ's determination, such that any error with regard to the other three reasons was harmless.") (citation omitted).

## II. LAY WITNESS TESTIMONY

### A. Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one

such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10–1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Further, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

**B.      Application of Law to Fact**

Here, the ALJ assigned "minimal weight" to Miller's lay witness testimony. (Tr. 26.) In support of his decision to discount Miller's testimony, the ALJ observed, among other things, that Miller "provided answers to questions for which he would have no knowledge given [that] he did not live with the claimant, such as sleeping habits, strongly suggesting he simply parroted" Plaintiff's allegations. (Tr. 26.) Accordingly, the ALJ found that Miller's reporting was "subject to the same credibility concerns discussed above in relation to" Plaintiff's testimony. (Tr. 26.)

Substantial evidence supports the ALJ's finding that Miller either parroted, or provided testimony that is substantially similar to, Plaintiff's complaints. Indeed, Miller's third party function report and Plaintiff's adult function report appear to answer nearly all of the questions in the same or similar fashion (in particular, the "yes" or "no" and check-box questions). (*Compare* Tr. 165-72, *with* Tr. 178-85.) Miller and Plaintiff's reports even include the same scrivener's error. (*See* Tr. 167, 180, indicating that Miller and Plaintiff both initially answered "no" to whether Plaintiff prepares her own meals, and that both Miller and Plaintiff scratched out

"no," amended the answer to "yes," and stated that Plaintiff prepares microwaveable meals twice a day). Accordingly, because the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective complaints, and because Miller's testimony is substantially similar to Plaintiff's complaints, it follows that the ALJ provided germane reasons for discounting Miller's testimony. Even assuming that the ALJ erred in rejecting Miller's testimony for other reasons, any error was harmless. *See Molina*, 674 F.3d at 1121-22 (adopting "the Eighth Circuit's well-reasoned determination that an ALJ's failure to [even] comment upon lay witness testimony is harmless where the same evidence that the ALJ referred to in discrediting the claimant's [testimony] also discredits the lay witness's [testimony]") (citation, quotation marks, and brackets omitted).

## III. MEDICAL OPINION EVIDENCE

Finally, Plaintiff argues that the ALJ erred in his "[c]onsideration" of Dr. Simmonds' opinion. (Pl.'s Opening Br. at 14.) In support of her argument, Plaintiff notes that: (1) Dr. Simmonds examined Plaintiff in October 2011, (2) "Dr. Simmonds assessed Plaintiff as capable of performing light work based on the information available to him," (3) Plaintiff underwent an MRI of her lumbar spine on November 8, 2011, (4) "[n]o treating or examining medical source[] considered Plaintiff's functional capacity" in light of the November 2011 MRI, and thus (5) Dr. Simmonds' opinion "should have served as a starting point for determining Plaintiff's [RFC] considering the subsequent worsening of Plaintiff's [lower back] condition." (Pl.'s Opening Br. at 14.)

The Court is not persuaded by Plaintiff's argument. Dr. Simmonds was aware that Plaintiff's x-rays and MRIs "have been consistent with degenerative disc disease of the lower lumbar" spine, and that physical therapy and epidural steroid injections resulted in only "minimal to moderate improvement." (Tr. 252.) Nevertheless, Dr. Simmonds' examination revealed that

Plaintiff was capable of performing light work in October 2011 (i.e., one month before the November 2011 MRI, which likewise revealed evidence of degenerative disease). (*See* Tr. 257, Tr. 395, indicating that a June 2013 MRI of Plaintiff's lumbar spine similarly revealed no "evidence of fracture" and "[m]oderate to advanced multilevel discogenic and facet degenerative disease," *see also* Tr. 19, indicating that the ALJ determined that Plaintiff's "multilevel discogenic and facet degenerative disease of the lumbar spine" is a severe impairment). Although Plaintiff implies that her lower back significantly worsened after October 2011 and that the November MRI reflects that fact, this argument appears to be premised on Plaintiff's own testimony, which the ALJ appropriately discounted as not entirely credible. (*See* Tr. 465-68, "[W]hat happened on November 8, 2011, that you feel made it impossible for you to continue working in any capacity? A. I had a boyfriend of seven years that passed away [in June 2010]. . . . [M]onths after that [i.e., 'right before Thanksgiving' in November 2011,] I had to move [off of his parents' property], [so] I was under a lot of stress and I started having seizures and my back . . . pain was getting worse [because I was having seizure-related falls and reinjured my lower back due to those falls]," *cf.* Def.'s Br. at 5, "Other than a single [self-]report of [a] 'seizure recently' . . . in January 2012, the undersigned was unable to locate medical records indicating she sought treatment for seizures from a medical provider.") Accordingly, Plaintiff has failed to identify any harmful error in the ALJ's consideration of Dr. Simmonds' opinion. *Cf. Quinones v. Berryhill*, 690 F. App'x 966, 967 (9th Cir. 2017) ("[T]he only evidence in the record that [the claimant's] flare-ups, loss of grip strength, and fatigue were frequent and debilitating was her testimony and self-reports to doctors, and she does not contest the ALJ's conclusion that she was 'not entirely credible.'") (citation omitted).

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this 12th day of March, 2018.

_____
STACIE F. BECKERMAN
United States Magistrate Judge